**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**
Stanley O. King (SBN #03413-1996)
Eric G. Kahn (SBN #02103-1993)
231 South Broad Street
Woodbury, NJ 08096
Tel: (856) 845-3001
Fax: (856) 845-3079
Sking@lawjw.com
EKahn@JaverbaumWurgaft.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONICA BLAIR-SMITH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CAESARS ENTERTAINMENT, INC.,<br><br>Defendant | Case No. 1:23-cv-22611<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

LOCAL CIVIL RULE 10.1 STATEMENT

Pursuant to Local Civil Rule 10.1(b), the required information for Plaintiff's counsel of record is provided above on the first page of the Complaint.

Pursuant to Local Civil Rule 10.1(a), the names and addresses of the Parties to this action are:

1. Plaintiff Monica Blair-Smith resides at 1400 S. 24th St., Philadelphia, PA 19146.

2. Defendant Caesars Entertainment, Inc. has its principal place of business at 100 West Liberty Street, 12th Floor, Reno, Nevada 89501.

Plaintiff Monica Blair-Smith ("Plaintiff") brings this action individually and on behalf of a class of all others similarly situated against the Defendant, Caesars Entertainment, Inc. ("Caesars" or "Defendant") and alleges the following:

## I.    NATURE OF THE ACTION

1.    Plaintiff brings this action, individually and on behalf of all other similarly situated individuals against Defendant because of Defendant's failure to adequately protect the sensitive personal and confidential information of thousands of customers — including, but not limited to, home addresses, email addresses, dates of birth, and Social Security numbers (collectively, "PII").

2.    This information was compromised in a massive security breach of Caesars' servers that was publicly disclosed on September 14, 2023 (the "Data Breach" or "Breach").[1] The security breach has been described as a "social engineering attack", which relies on the simple method of tricking a target into giving hackers sensitive information. The Scattered Spider hacking group, a well-known group that has engaged in data extortion schemes against several large corporations in the last few years, took credit for the Breach.[2] The true extent of the Breach is still unknown, as is the actual date of occurrence of the Breach. However, the Breach implicates thousands of customers who have rented guest rooms or gambled at Caesars' properties throughout the United States.

3.    To date, while Caesars has begun notifying affected customers, these notifications have been delayed and are ongoing. In the interim, Plaintiff and other affected Class Members

---

[1]  Caesars Entertainment, Inc. Form 8-K filed on September 14, 2023. Available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001590895/000119312523235015/d537840d8k.htm.

[2] https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/.

have been deprived of the opportunity to quickly take the necessary measures to protect their PII and minimize potential harm.

## II.    THE PARTIES

### A. Plaintiff

4.      Plaintiff Monica Blair-Smith ("Plaintiff") is a citizen and resident of the Commonwealth of Pennsylvania. Plaintiff directly rented a room from a Caesars' hotel-casino property during the Class Period.

5.      On or about March 20, 2023, Plaintiff reserved multiple guestrooms at the Tropicana Atlantic City Hotel and Casino, which she directly rented and paid for through Caesars Entertainment's online booking platform. Plaintiff stayed overnight in a guestroom at Tropicana Atlantic City on or about August 5, 2023.

6.      Like millions of other Caesars' customers, Plaintiff entered several pieces of PII to reserve and pay for the guestroom.

7.      Upon information and belief, Plaintiff's PII was compromised in the Data Breach.

8.      Plaintiff would not have given Caesars her PII if she had known that such information was vulnerable to cyberattack due to Caesars' inadequate data security measures and systems.

### B. Defendant

9.      Defendant Caesars Entertainment, Inc. is a publicly traded Delaware corporation headquartered in Reno, Nevada.

10.     Caesars Entertainment, Inc., through wholly-owned subsidiary Caesars Entertainment Operating Company, LLC, operates several casinos in Atlantic City, New Jersey, including Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino ("Caesars Atlantic City"), Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel

& Casino ("Harrah's Atlantic City"), and Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City ("Tropicana Atlantic City").

## III.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Caesars. See 28 U.S.C. § 1332(d)(2)(A). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.    This Court has personal jurisdiction over Caesars, because Caesars' has sufficient minimum contacts with the state of New Jersey. Caesars owns and operates several casino-hotels in Atlantic City, New Jersey, and thus conducts substantial business within this judicial district. Caesars intentionally avails itself of the consumers and markets within the state of New Jersey through the maintenance of gaming licenses for its Atlantic City casino-hotel properties, as well as the promotion, marketing, and sale of guestrooms and gaming products. Thus, this Court has general personal jurisdiction over Caesars.

13.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) because, as noted above, Caesars conducts substantial business in this district.

## IV.    GENERAL ALLEGATIONS

### A. Defendant Collects and Stores Plaintiff's and Class Members' PII

14.    Caesars is one of the most well-known providers of casino lodging and entertainment in the United States. As of December 2022, Defendant owned, leased, or managed 51 properties across 16 states in the U.S.[3] These properties house over 47,000 guest rooms, 2,800

---

[3] Caesars 2022 10-K at 4.

table games (e.g., craps, blackjack, etc.), and 52,800 slot machines, video lottery stations, and e-tables.[4] Caesars also operates online or mobile gaming outlets and non-gaming properties throughout the United States.

15.    As part of its operations, Caesars collects a massive amount of its customers' sensitive personal information, including credit card and debit card numbers, expiration dates, cardholder names, three or four-digit security codes (commonly referred to as "CVV" codes), and PII such as home addresses, dates of birth, driver's license or passport numbers, and Social Security numbers.[5] Indeed, to reserve a guest room at a Caesars' property, customers like Plaintiff are required to provide Caesars with payment card information and PII to secure and later pay for the accommodations. All of this data is stored on Caesars' information technology network.

16.    PII is incredibly valuable because it is essential to conduct everyday business – from applying for employment or government benefits, to securing financing for major purchases such as a home or vehicle. In the wrong hands, it can allow a person to commit harmful and serious crimes such as financial fraud and identity theft. Thus, Plaintiff and Class Members take measures to safeguard this data and to prevent its misuse, including concealing their usernames and passwords from the public sphere and avoiding disclosing their PII on suspicious or unsafe websites.

17.    On information and belief, Caesars is s a sophisticated conglomerate that collects, processes, and stores tens of thousands of pieces of PII daily. Therefore, Caesars knew or should have known the importance of safeguarding this information against misappropriation. Caesars knew or should have known that it was responsible for maintaining reasonable safeguards to

---

[4] *Id.*

[5] See https://www.caesars.com/corporate/privacy

protect its customers' PII from unauthorized access or use. Caesars also knew or should have known that in relaying this information, its customers were entitled to and did in fact rely on Caesars to keep that PII secure from would-be data thieves.

**B. Defendant's Information Technology Network is Attacked**

18.     On September 14, 2023, Caesars filed an 8-K with the Securities and Exchange Commission. 8-K filings are public and are intended to announce major events that may occur out-of-cycle with other periodic filing requirements for public companies. The September 14th filing was one such announcement.

19.     In its 8-K Caesars gave sparse details regarding "suspicious activity in its information technology network resulting from a social engineering attack on an outsourced IT support vendor used by [Caesars]."[6]

20.     According to Caesars, "on September 7, 2023, we determined that the unauthorized actor acquired a copy of, *among other data*, our loyalty program database, which includes driver's license numbers and/or social security numbers for a significant number of members in the database. We are still investigating the extent of any additional personal or otherwise sensitive information contained in the files acquired by the unauthorized actor." (emphasis added). Caesars has not disclosed how many customers were affected by the Data Breach, and although the 8-K indicates that the loyalty program database was compromised, it does not state which other customer databases were also accessed. In short, "among other data" is another way of saying that Caesars has not yet determined what additional customer data was accessed.

21.     It was later revealed that the Scattered Spider hacking group engaged in a social engineering attack to access and steal six terabytes of data from Caesars' databases.

---

[6] Caesars' September 14, 2023 8-K.

22.     Caesars "launched an investigation, engaged leading cybersecurity firms to assist, and notified law enforcement and state gaming regulators", but to date, it is wholly unclear what such investigative efforts involve. Indeed, upon information and belief, the investigation is still ongoing, and Caesars has not provided any further information or details about the breadth of the systems that were attacked, a concrete description of customer profiles and information that was compromised, or even when the attack actually occurred.

23.     Caesars has indicated that it will notify impacted individuals on a rolling basis. But this promise rings hollow when Caesars has not been forthcoming about details of the Data Breach that would put customers on notice. To date, Plaintiff has not been notified by Caesars whether her information has been compromised due to the Breach and will not know for an extended period of time.

**C.  Defendant Had Inadequate Measures in Place to Prevent the Breach**

24.     Caesars is, and at all relevant times has been, aware the PII it collects and maintains on behalf of its customers is highly sensitive and could be used for nefarious purposes by unauthorized third parties.

25.     In fact, according to security experts, businesses like Caesars, whose portfolio of ventures includes hotels, "are an attractive target for hackers because they hold a lot of sensitive information, including credit card and passport details, but often don't have security standards as tough as those of more regulated industries, like banking."[7]

---

[7] Amie Tsang & Adam Stariano, "Marriott Breach Exposes Data of Up to 500 Million Guests," The New York Times, available at https://www.nytimes.com/2018/11/30/business/marriott-data-breach.html (last accessed

November 30, 2018).

26.     And Caesars' explicit statements in its Privacy Policy make clear that Caesars recognized the importance of adequately safeguarding its customers' PII, yet it failed to take the steps necessary to protect that sensitive data. In fact, Caesars' Privacy Policy explicitly states that Caesars "maintain[s] physical, electronic and organizational safeguards that reasonably and appropriately protect against the loss, misuse and alteration of the information under our control."[8]

27.     Caesars is thus aware of the importance of safeguarding its customers' PII from the foreseeable and serious consequences that would occur if its data security systems and computer servers were breached.

28.     In spite of these facts, Caesars' safeguards were inadequate and failed on or around September 7, 2023. Caesars qualified the event as a "social engineering attack", and the Scattered Spider hacking group took credit for taking six terabytes of data from Caesars.[9]

29.     Scattered Spider "is one of the most disruptive hacking outfits in the United States, according to Google's Mandiant Intelligence", and have been linked to over 100 cyberattacks in the last two years.[10] Caesars' knew or should have known that its systems were vulnerable to an attack from such a group, and should have (but did not) take extensive measures to safeguard its customers' PII.

30.      Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has identified that: "If your data

---

[8] https://www.caesars.com/corporate/privacy

[9] https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/

[10] *Id.*

was stolen through a data breach that means you were somewhere out of compliance" with industry data security standards.[11]

### i.    Defendant Did Not Comply With Industry Standards With Regard to Confidential Consumer Data Security.

31.    Caesars' security flaws ran afoul of industry best practices and standards.

32.    Industry best practices include, but are not limited to, implementing a multi-layer security system that incorporates firewalls and anti-malware and antivirus software; developing and maintaining secure systems and applications; utilizing data encryption; regularly testing security systems and processes; ensuring that all employees are educated about the security measures in place; restricting access to customer data on a need-to-know basis; tracking and monitoring all access to network resources and customer data; and identifying and authenticating access to system components.

33.    The National Institute of Standards and Technology ("NIST") at the U.S. Department of Commerce "helps businesses of all sizes better understand, manage, and reduce their cybersecurity risk and protect their networks and data."[12] The NIST cybersecurity framework guidance largely echo those outlined above and include: developing strong encryption practices surrounding the transmittal of all PII; regularly run up-to-date anti-malware programs on individual computers and on servers on the business' network; and staying aware of new vulnerabilities.

---

[11] Lisa Baertlin, *Chipotle Says Hackers Hit Most Restaurants in Data Breach*, REUTERS (May 26, 2017), *available at* https://www.reuters.com/article/us-chipotle-cyber-idUSKBN18M2BY (last accessed Jan. 3, 2020).

[12]                    https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework#:~:text=NIST%20is%20the%20National%20Institute,The%20Framework%20is%20voluntary.

34.     Caesars failed to adopt these reasonable safeguards, resulting in the compromise of millions of pieces of PII.

### ii.    Defendant Falls Short of FTC Compliance With Regard to Confidential Consumer Data Security.

35.     Caesars, through its failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data, has violated Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. § 45.

36.     First published in 2007, but updated in 2016, The Federal Trade Commission's ("FTC") document "Protecting Personal Information: A Guide for Business" highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks. These guidelines advise businesses to take the following steps to establish reasonable data security practices: protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[13]

---

[13] FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Nov. 2011), *available at* lltips://www.itc.00vitips-advice/business-center/quidance/protectina-personal-information-guide-business (last accessed Jan. 3, 2020).

37.     According to the FTC, the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

38.     The FTC has issued orders against businesses that violated the FTC Act by failing to employ reasonable measures to secure customer PII. Not only do these orders serve as enforcement mechanisms, but they also provide further guidance to businesses with regard to their data security obligations.

39.     Caesars, well-aware of their obligations to implement fair and reasonable safeguards to protect customers' PII under the FTC Act, has fallen short of fulfilling these responsibilities and exposed its customers to high-risk data breaches.

### D.  Caesars Response to the Data Breach is Insufficient

40.     The untimely and inadequate notification of the Data Breach has damaged Plaintiff and Class Members. Caesars should have timely disclosed to Plaintiff and Class Members that their PII was compromised. A timely disclosure would have allowed Plaintiff and Class Members to take appropriate measures to monitor and protect their PII.

41.     In addition, Caesars' offer of twenty-four months of free credit monitoring and identity theft protection is inadequate. Data thieves will be aware of the temporal scope of the protection offered to guests and can simply wait out the time as is the typical *modus operandi* of such cyber criminals.

42.     Further, despite reporting that the cyberattack involved "other data", Caesars has only offered these services to members of the Caesars Rewards Loyalty Program.  This remedy is unacceptable, given the massive amount of data that was stolen and that the investigation is still ongoing.

**E.  Plaintiff and Class Members Have Been Injured by Caesars' Negligence.**

43.    Caesars' proposed remedy does nothing to protect the millions of customers who had their PII exposed to criminals, and does not ensure protection from fraud going forward.

44.    In fact, Caesars' customers' stolen PII may also be sold on the "dark web" at some undetermined point in the future.

45.    Credit monitoring and identity theft protection does not necessarily prevent actual fraud. Because criminals can use the PII from the Breach to drain bank accounts, steal tax refunds, or open utility accounts, Plaintiff and Class Members still must employ heightened scrutiny to ensure that their PII is not being misappropriated. These are harms that Plaintiff and Class Members can suffer far into the future, long after Caesars stops providing *some* of its customers credit monitoring or identity theft protection.

46.    Furthermore, Caesars' failure to adequately protect its customers' PII has resulted in customers having to undertake various tasks (e.g., obtaining credit monitoring, checking credit reports, monitoring accounts, etc.) that require time and effort that they would otherwise not have expended on these efforts. At the same time, Caesars has withheld important details about the Data Breach as it conducts its investigation and is putting the burden on the consumer to discover possible fraudulent transactions.

47.    All of this translates into, according to the Department of Justice, victims of "misuse of…personal information to open a new account or conduct other fraud", the exact type of fraud to which Caesars has exposed its customers, "spen[ding] a mean of 7 hours resolving problems."[14]

---

[14] https://bjs.ojp.gov/document/vit21.pdf

## V.    CLASS ALLEGATIONS

48.    Plaintiff brings this action on behalf of herself, as representative of the Class defined below, pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and seeks certification of the following Nationwide Class:

> All persons in the United States whose PII was compromised due to the Data Breach announced on September 14, 2023 by Caesars Entertainment, Inc.

49.    Plaintiff reserves the right to revise the above Class definitions and any of the averments of fact herein based on facts adduced in discovery.

50.    The Class is so numerous that joinder of all members in this action is impracticable. There are millions of geographically dispersed Class members.

51.    The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, Caesars' electronic records.

52.    Plaintiff's claims are typical of those of the Class. Plaintiff and all members of the Class were injured by Caesars' alleged uniform negligence. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiff and each Class Member had their PII compromised in the same way by the same conduct by Caesars.

53.    Plaintiff will fairly and adequately protect and represent the interests of Class members. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not antagonistic to, the interests of the Class members. Plaintiff is willing and able to dispatch the duties incumbent upon a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel has significant experience successfully prosecuting complex class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

54.     There are multiple questions of law and fact that are common to the Class, including, but not limited to:

i.      Whether Defendant's data security systems complied with applicable state and federal laws and regulations;

ii.     Whether Defendant's data security systems met minimum industry and FTC standards;

iii.    Whether Defendant knew or should have known that its data security systems were inadequate and vulnerable to cyberattack;

iv.     Whether Defendant owed duties to Plaintiff and members of the Class to protect their PII and to provide timely and accurate notice of the Data Breach to Plaintiff and the Class, and whether it breached these duties;

v.      Whether Defendant's conduct was the proximate cause of the Data Breach resulting in the theft of Plaintiff's and Class members' PII;

vi.     Whether Defendant wrongfully failed to inform Plaintiff and members of the Class that it did not maintain computer software and other security procedures and precautions sufficient to reasonably safeguard consumers' PII;

vii.    Whether Defendant has taken adequate preventive and precautionary measures to ensure Plaintiff and Class members will not experience further harm;

viii.   Whether Defendant violated the New Jersey Consumer Fraud Act;

ix.     Whether Plaintiff and members of the Class suffered injury as a proximate result of Defendant's conduct or failure to act; and

x.      Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief, and the extent of the remedies that should be afforded to Plaintiff and the Class.

55.     Questions of law and fact common to the members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

56.     Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow the scores of Class members to prosecute their common claims, and for Defendant to defend itself against these claims, in front of a single court simultaneously and

efficiently before ultimately reaching resolution without the unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### NEGLIGENCE

### (On Behalf of Plaintiff and the Class)

57.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

58.    Caesars collected PII from Plaintiff and Class members in exchange for its sale of guestrooms, rewards program benefits, and other services at its various properties throughout the United States.

59.    Caesars owed a duty to Plaintiff and the Class to maintain the confidentiality of and to exercise reasonable care in safeguarding and protecting the PII in Caesars' possession from being compromised by unauthorized persons. This duty included, among other things, designing, maintaining, and testing Caesars' networks and data security systems to ensure that Plaintiff's and Class members' PII in Caesars' possession was adequately protected while stored on Caesars' systems.

60.    Caesars owed a duty to Plaintiff and Class members to provide security consistent with industry standards and requirements and to ensure that its computer systems and networks adequately protected the PII of Plaintiff and Class members whose confidential data Caesars obtained and maintained.

14

61. Caesars knew, or should have known, of the risks inherent in collecting and storing Plaintiff's and Class members' PII and the critical importance of providing adequate security for that information.

62. Caesars' conduct created a foreseeable risk of harm to Plaintiff and Class members. This conduct included, but was not limited to, Caesars' failure to take the measures to prevent the Data Breach and its decision not to comply with industry standards for the safekeeping and maintenance of Plaintiff's and Class members' PII.

63. Caesars knew or should have known that it had inadequate computer systems and data security practices to safeguard such information, and Caesars knew or should have known that hackers would attempt or were attempting to access the PII in databases such as Caesars'.

64. Caesars breached the duties it owed to Plaintiff and members of the Class by failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect Plaintiff's and Class members' PII, as identified above. This breach was a proximate cause of injuries and damages suffered by Plaintiff and Class members.

65. As a direct and proximate result of Caesars' negligent conduct, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial.

## COUNT II

### NEGLIGENCE *PER SE*

### (On Behalf of Plaintiff and the Class)

66. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

67.     Pursuant to the FTC Act, 15 U.S.C. § 45, Caesars had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

68.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Caesars, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Caesars' duty to protect Plaintiff's and Class members' sensitive information.

69.     Caesars violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein.

70.     The harm that has occurred is the type of harm the FTC Act (and similar state statutes) is intended to guard against.

71.     Caesars had a duty to Plaintiff and Class members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class members' PII.

72.     Caesars breached its duties to Plaintiff and Class members under the FTC Act (and similar state statutes), by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' PII.

73.     Caesars' violation of Section 5 of the FTC Act (and similar state statutes) and its failure to comply with applicable laws and regulations constitutes negligence per se.

74.     But for Caesars' wrongful and negligent breach of its duties owed to Plaintiff and Class members, they would not have been injured.

75.    The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Caesars' breach of its duties. Caesars knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiff and Class members to suffer the foreseeable harms associated with the exposure of their PII.

76.    Had Plaintiff and Class members known that Caesars did and does not adequately protect customers' PII, they would not have given their PII to Caesars'.

77.    As a direct and proximate result of Caesars' negligence per se, Plaintiff and Class members have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

## COUNT III

### BREACH OF IMPLIED CONTRACT

### (On Behalf of Plaintiff and the Class)

78.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

79.    Plaintiff and Class members who gave their PII to Caesars during the period in which the Data Breach occurred had implied contracts with Caesars.

80.    Specifically, Plaintiff and Class members entered their PII into Caesars databases to obtain various products and services from Caesars. In exchange, Caesars agreed, among other things: (l) to provide various services to Plaintiff and Class members; (2) to take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII; and (3)

17

to protect Plaintiff's and Class members' PII in compliance with federal and state laws and regulations and industry standards.

81.     Protection of PII is a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Caesars, on the other hand. Indeed, as set forth, *supra*, Caesars recognized the importance of data security and the privacy of customers' sensitive financial information in its Privacy Policy. Had Plaintiff and Class members known that Caesars would not adequately protect its customers' PII, they would not have given their PII to Caesars.

82.     Caesars did not satisfy its promises and obligations to Plaintiff and Class members under the implied contracts because it did not take reasonable measures to keep their PII secure and confidential, and did not comply with applicable laws, regulations, and industry standards.

83.     Caesars materially breached its implied contracts with Plaintiff and Class members by failing to implement adequate data security measures.

84.     Plaintiff and Class members fully performed their obligations under their implied contracts with Caesars.

85.     Caesars' failure to satisfy its obligations led directly to the successful intrusion of Caesars' computer servers and stored data and led directly to unauthorized parties' access to and exfiltration of Plaintiff's and Class members' PII.

86.     Caesars breached these implied contracts because of its failure to implement appropriate, sufficient security measures.

87.     Also, as a result of Caesars' failure to implement necessary security measures, Plaintiff and Class members have suffered actual damages resulting from the theft of their PII and remain at imminent risk of suffering additional damages in the future.

88.     Accordingly, Plaintiff and Class members have been injured as a proximate result of Caesars' breaches of implied contracts and are entitled to damages and/or restitution in an amount to be proven at trial.

**COUNT IV**

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. § 56:8-2,** *et seq.*

**(On Behalf of Plaintiff and the Class)**

89.     Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

90.     Plaintiff and Class members are consumers who entered their PII on Caesars' website in order to reserve guestrooms, enroll in the Caesars Rewards Loyalty Program, or obtain various other services from Caesars properties in New Jersey.

91.     Caesars engaged in the conduct alleged in this Complaint in transactions intended to result, and which did result, in the sale of "merchandise" to consumers, as defined by N.J. STAT. ANN. § 56:8-1.

92.     Caesars is engaged in, and its acts and omissions affect, trade and commerce. Caesars' relevant acts, practices and omissions complained of in this action were done in the course of Caesars' business of marketing and offering for sale various services throughout the state of New Jersey.

93.     The New Jersey Consumer Fraud Act ("NJCFA"), N.J. STAT. ANN. § 56:8-2, et seq., prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New Jersey.

94.     In the conduct of its business, trade, and commerce, and in the sale of services to consumers in the state of New Jersey, Caesars collected and stored highly personal and private information, including the PII of Caesars' customers, like Plaintiff and members of the Class.

95.     Caesars knew or should have known that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiff and the Class and that the risk of a data breach was highly likely. The extent of the Data Breach is still unknown but is likely to impact tens of thousands of consumers who visited Caesars' properties in New Jersey.

96.     Caesars should have disclosed this information regarding the shortcomings of its computer systems and data security practices because Caesars was in a superior position to know the true facts related to the security vulnerability, and members of the Class could not reasonably be expected to learn or discover the true facts.

97.     As alleged herein, Caesars engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and the sale of services to consumers in the state of New Jersey, in violation of the NJCFA, including but not limited to:

   i.    Failing to adequately secure the PII of Plaintiff and members of the Class;

   ii.   Failing to maintain adequate computer systems and data security practices to safeguard customers' PII;

   iii.  Misrepresenting the material fact that Caesars would maintain adequate data privacy and security practices and procedures to safeguard customers' PII from unauthorized disclosure, release, data breaches, and theft;

   iv.   Misrepresenting the material fact that Caesars did and would comply with the requirements of relevant federal and state laws and industry standards pertaining to the privacy and security of the PII of Plaintiff and members of the Class;

   v.    Knowingly omitting, suppressing, and concealing the material fact that Caesars' computer systems and data security practices were inadequate to safeguard customers' PII from theft, with the intent that others rely upon the omission, suppression, and concealment; and

      vi.    Failing to disclose in a timely and accurate manner to Plaintiff and the Class the material fact of the nature and extent of the Data Breach.

98.    By engaging in the conduct alleged above, Caesars has violated the NJCFA by, *inter alia*:

      i.    Omitting material facts regarding the goods and services sold;

      ii.    Omitting material facts regarding the security of customers' PII, between Caesars and its customers for the purchase of services;

      iii.    Misrepresenting material facts in the furnishing or sale of services;

      iv.    Engaging in conduct that is likely to mislead consumers acting reasonably under the circumstances;

      v.    Engaging in conduct which creates a likelihood of confusion or of misunderstanding;

      vi.    Engaging in conduct that is immoral, unethical, oppressive and unscrupulous;

      vii.    Unfair practices that caused or were likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers; and/or

      viii.    Other unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices to be shown at trial.

99.    Caesars' actions engaging in the conduct above were negligent, knowing and willful and/or wanton and reckless with respect to the rights of the Class.

100.    As a direct and proximate result of Caesars' violation of the NJCFA, members of the Class have suffered ascertainable losses of moneys and actual damages including, *inter alia*:

      i.    Theft of their PII by criminals;

      ii.    Costs associated with the detection and prevention of identity theft;

      iii.    Costs associated with the unauthorized use of their PII;

      iv.    Costs and lost time associated with handling the administrative consequences of the data breach, including identifying, and disputing misappropriated PII, and shopping for credit monitoring and identity theft protection;

     v.    Impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and already being misused; and/or

    vi.    The continued risk to their PII, which has been accessible to criminals for an undisclosed amount of time and which remains on Caesars's insufficiently secured computer systems.

101.    As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices of Caesars alleged herein, the Class seeks relief under N.J. STAT. ANN. § 56:8-19, including, but not limited to, actual damages, treble damages, injunctive relief, and attorneys' fees and costs.

102.    Pursuant to N.J. STAT. ANN. § 56:8-20, this Complaint will be served upon the New Jersey Attorney General.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and the Class, respectfully requests that the Court grant the following relief:

A.  Certify this case as a class action, appoint Plaintiff as Class representative and her counsel as Class counsel;

B.  Enter judgment in favor of Plaintiff and the other members of the Class, and against Caesars under the legal theories alleged herein;

C.  Award Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, and restitution;

D.  Award Plaintiff and the Class equitable, injunctive, and declaratory relief as may be appropriate;

E.  Award Plaintiff and the Class reasonable attorneys' fees and costs as allowable; and

F.  Award Plaintiff and the Class such other favorable relief as allowable under law or at equity.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

**DATED:** November 22, 2023

/s/ *Stanley O. King* _____
    Stanley O. King

**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**
Stanley O. King (SBN #03413-1996)
Eric G. Kahn (SBN #02103-1993)
231 South Broad Street
Woodbury, NJ 08096
Tel: (856) 845-3001
Fax: (856) 845-3079
Sking@lawjw.com
EKahn@JaverbaumWurgaft.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes (SBN #00062-1995)
Jeffrey L. Spector (SBN #03375-2007)
Icee N. Etheridge (SBN #20256-2016)
Diana J. Zinser (*pro hac vice forthcoming*)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
bcaldes@srkattorneys.com
jspector@srkattorneys.com
ietheridge@srkattorneys.com
dzinser@srkattorneys.com

**REINHARDT WENDORF & BLANCHFIELD**
Garrett D. Blanchfield (*Pro Hac Vice forthcoming*)
Brant D. Penney (*Pro Hac Vice forthcoming*)
222 South 9th St, Ste. 1600
Minneapolis, MN 55402
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

**MCLAFFERTY LAW FIRM, P.C.**
David McLafferty (*Pro Hac Vice forthcoming*)
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000, ext. 12
dmclafferty@mclaffertylaw.com

*Counsel for Plaintiff*